157 F.3d 106
 Franklin HENDERSON, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
Saul NAVAS, Petitioner,
v.
Janet RENO, as Attorney General of the United States, et
al., Respondent.
Engin YESIL, Petitioner-Appellee,
v.
Janet RENO, Attorney General; Doris Meissner, Commissioner
of the Immigration and Naturalization Service; Immigration
and Naturalization Service; John B.Z. Caplinger, District
Director; Nancy Hooks, Officer in Charge, Respondents-Appellants.
Guillermo MOJICA, Petitioner-Appellee,
v.
Janet RENO, as Attorney General of the United States, et
al., Respondents-Appellants.
Saul NAVAS, Petitioner-Appellee,
v.
Janet RENO, as Attorney General of the United States, et
al., Respondents-Appellants.
 Docket Nos. 97-4050, 97-4070, 97-2629, 97-2599 and 97-2600.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 21, 1998.
Decided Sept. 18, 1998.
 
 Kerry William Bretz, Bretz & Associates, New York, NY, (Alan Strauss, on the brief), for Petitioner Henderson, No. 97-4050.
 Helaine Barnett, The Legal Aid Society, New York, NY, (Scott A. Rosenberg, Gemma Solimene, and Olivia Cassin, on the brief), for Petitioner Navas, No. 97-4070.
 Manuel D. Vargas, New York, NY, for Petitioner Navas, No. 97-4070.
 Lucas Guttentag, American Civil Liberties Union Foundation, New York, NY, Counsel on Jurisdiction (Lee Gelernt and Michael J. Wishnie, on the brief), for Petitioners Henderson, No. 97-4050, and Navas, No. 97-4070.
 Michael P. DiRaimondo, New York, NY, and Thomas E. Moseley, Newark, NJ, for Petitioners Henderson, No. 97-4050, and Navas, No. 97-4070.
 Scott A. Rosenberg, Director of Litigation, Civil Appeals & Law Reform Unit, New York, NY, and Manuel D. Vargas, New York, NY, for Petitioner Navas, No. 97-4070.
 Diogenes P. Kekatos, for Mary Jo White, United States Attorney for the Southern District of New York, New York, NY (James A. O'Brien, III, Special Assistant United States Attorney, Steven M. Habar, Assistant United States Attorney, on the brief), for Respondents, Nos. 97-4050, 97-4070.
 Michael P. DiRaimondo, New York, NY, (Thomas E. Moseley, Marialaina L. Masi, on the brief), for Petitioner-Appellee Yesil, No. 97-2629.
 Diogenes P. Kekatos, for Mary Jo White, United States Attorney for the Southern District of New York, New York, NY (James A. O'Brien, III, Special Assistant United States Attorney, Steven M. Habar, Assistant United States Attorney, on the brief), for Respondents-Appellants, No. 97-2629.
 Kerry William Bretz, Bretz & Associates, New York, NY, (Alan Strauss, on the brief), for Petitioner-Appellee Mojica, No. 97-2599.
 Helaine Barnett, The Legal Aid Society, New York, NY (Scott A. Rosenberg, Gemma Solimene, and Olivia Cassin, on the brief), for Petitioner-Appellee Navas, No. 97-2600.
 Manuel D. Vargas, New York, NY, for Petitioner-Appellee Navas, No. 97-2600.
 Lucas Guttentag, American Civil Liberties Union Foundation, New York, NY, Counsel on Jurisdiction (Lee Gelernt, Cecillia Wang, and Michael J. Wishnie, on the brief), for Petitioners-Appellees Mojica, No. 97-2599, and Navas, No. 97-2600.
 Scott A. Rosenberg, Director of Litigation, Civil Appeals & Law Reform Unit, New York, NY, and Manuel D. Vargas, New York, NY, for Petitioners-Appellee Navas, No. 97-2600.
 Scott Dunn, for Zachary W. Carter, United States Attorney for the Eastern District of New York, New York, NY (Deborah B. Zwany and Varuni Nelson, Assistant United States Attorneys, Mary Elizabeth Delli-Pizzi, Special Assistant United States Attorney, and Quynh Vu, Office of Immigration Litigation, United States Department of Justice, on the brief), for Respondents-Appellants, Nos. 97-2599, 97-2600.
 Gerald L. Neuman and Lenni B. Benson, New York, NY, on behalf of Law Professors filing as amici curiae, for Petitioners-Appellees Mojica, No. 97-2599, and Navas, No. 97-2600.
 Before: McLAUGHLIN and CALABRESI, Circuit Judges, and OWEN, District Judge.*
 CALABRESI, Circuit Judge:
 
 
 1
 These cases concern the scope of federal court jurisdiction to review the legality of deportation orders issued by the Immigration and Naturalization Service (the "INS"). The petitioners before us are legal permanent residents of the United States who have been ordered deported because of their past criminal convictions. They challenge the Attorney General's interpretation of the immigration laws under which they face deportation. While the statutory provisions before us today are new ones,[1] the questions raised by these cases are old. Guided by a century's worth of Supreme Court decisions, we conclude that the question of whether the INS had the legal authority to act as it did is within the jurisdiction of the federal courts. And following recent decisions of this Circuit, we hold that this jurisdiction is to be exercised under the general habeas corpus statute, 28 U.S.C. § 2241 (Supp.1998).[2] Because personal jurisdiction over the respondent cited in two of the habeas petitions before us depends on interpretations of New York law as to which we are uncertain, we certify the relevant questions in those cases to the New York Court of Appeals.
 
 I. FACTS & PROCEDURAL HISTORY
 A. Franklin Henderson
 
 2
 Petitioner Franklin Henderson has been a legal permanent resident ("LPR") of the United States for thirty years. Most members of his immediate family reside in this country, and some of them are citizens. In May 1987, Henderson pled guilty to criminal possession of cocaine in the second degree under New York law. He was sentenced to a prison term of five-years-to-life, and was incarcerated until April 1992. His conviction rendered him deportable under the then-effective provisions of § 241(a)(2)(B)(i) of the INA (codified at 8 U.S.C. § 1251(a)(2)(B)(i) (1994)). In February 1994, the INS initiated deportation proceedings against Henderson.
 
 
 3
 At a deportation hearing on May 3, 1994, Henderson conceded that he was deportable under INA § 241, but indicated his intent to apply for a discretionary waiver of deportation pursuant to INA § 212(c) (codified at 8 U.S.C. § 1182(c) (1994)). Since 1952, long-time LPRs like Henderson have been eligible to seek discretionary waivers of deportation or exclusion based on factors such as length of prior residence in the United States, family and personal ties to this country, positive histories of employment and community service, evidence of good character, and (for those persons deportable by reason of having committed a crime) proof of genuine rehabilitation. See 8 U.S.C. § 1182(c) (1994) (added by the Immigration and Naturalization Act of 1952); see also Lovell v. INS, 52 F.3d 458, 461 (2d Cir.1995) (listing factors to be considered in an application for a § 212(c) waiver).
 
 
 4
 The first hearing on Henderson's § 212(c) application was held on October 12, 1995. At the hearing, the INS stipulated that, based on the many positive factors in his case, Henderson would warrant § 212(c) relief as a matter of discretion, but raised a question as to whether he was eligible for such relief under then-existing law. At that time, aliens who had served five years or more in prison for an aggravated felony conviction were statutorily ineligible for § 212(c) relief, and the law in this Circuit was unsettled as to whether criminal possession of a controlled substance in the second degree constituted an "aggravated felony." The hearing was adjourned so that the parties could brief the issue.
 
 
 5
 On March 22, 1996, the Second Circuit held that criminal possession was not an aggravated felony. See Aguirre v. INS, 79 F.3d 315, 317 (2d Cir.1996). Accordingly, when Henderson's case came before an Immigration Judge ("IJ") on May 2, 1996, the IJ held that Henderson was eligible for § 212(c) relief and granted him a waiver of deportation.
 
 
 6
 While Henderson's case was pending, Congress enacted a bill that made substantial changes to the immigration laws. This bill, the AEDPA, took effect on April 24, 1996. Section 440(d) of the AEDPA greatly expanded the range of crimes that rendered aliens statutorily ineligible for § 212(c) relief. Under the new law, a person convicted of criminal possession of a controlled substance in the second degree was rendered ineligible for a § 212(c) waiver.
 
 
 7
 The INS took the position that AEDPA § 440(d) should apply retroactively to cases pending on the date of its enactment. The Board of Immigration Appeals ("BIA") rejected this position, ruling that § 440(d) could not be applied retroactively to persons who had applied for § 212(c) relief before the AEDPA's effective date. See In re Soriano, Int. Dec. No. 3289, 1996 WL 426888 (BIA June 27, 1996) ("Matter of Soriano I "). The Attorney General, exercising her statutory authority over the whole of the INS, see 8 U.S.C. § 1103(a)(1) (Supp.1998), reversed the BIA and issued an opinion concluding that § 440(d) should be applied retroactively to all pending cases regardless of when the waiver application was made. See Matter of Soriano, Int. Dec. No. 3289, 1996 WL 426888 (Op.Att'y Gen.Feb. 21, 1997) (beginning at * 16) ("Soriano II ").
 
 
 8
 On the basis of the Attorney General's ruling in Soriano II, the BIA summarily reversed the waiver of deportation that had been granted to Henderson. Henderson, contending that the Attorney General's interpretation of § 440(d) in Soriano II was incorrect, filed a petition for review of the BIA's decision in this Court on April 1, 1997. See Henderson v. INS, Docket No. 97-4050. That petition is before us today.[3]
 
 B. Saul Navas
 
 9
 Saul Navas has been a LPR of the United States since he arrived here from Panama in 1987, when he was twelve years old. His entire immediate family lives in this country, either as LPRs or as citizens. He has no close relatives in Panama. On May 2, 1995, Navas was convicted in New York state court as the result of pleading guilty to two separate criminal charges. In the first case, which involved driving a stolen automobile, he pled guilty to possession of stolen property in the third degree. In the second case, which involved a purse-snatching incident, he pled guilty to robbery in the third degree. Navas received concurrent sentences of one-and-a-half-to-four years, but satisfied his sentences by spending eight months in New York's "Shock Incarceration Program." While Navas was incarcerated, the INS began deportation proceedings against him. He first appeared before an IJ on October 11, 1995, but his case was continued until November 8, 1995, when, acting pro se, Navas admitted the allegations and was found deportable. The IJ encouraged Navas to apply for a § 212(c) waiver, for which he was then eligible, and Navas did so on December 8, 1995.
 
 
 10
 On May 9, 1996, a hearing was held on Navas' application for a § 212(c) waiver. The IJ determined that Navas' residence in the United States since a young age, his substantial family ties to this country, and his history of steady employment weighed strongly in favor of allowing him to remain in this country. Accordingly, the IJ granted him a § 212(c) waiver. The BIA reversed, however, holding that, under the Attorney General's intervening opinion in Soriano II, AEDPA § 440(d) applied retroactively to render Navas statutorily ineligible for § 212(c) relief.[4]
 
 
 11
 Navas then filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York (Jack B. Weinstein, Judge ). That court concluded that it had jurisdiction to review Navas' claims under the general habeas statute, 28 U.S.C. § 2241. See Mojica v. Reno, 970 F.Supp. 130 (E.D.N.Y.1997). The court further held, as a matter of statutory construction, that AEDPA § 440(d) should not apply retroactively to Navas' case. See id. at 165. Accordingly, the court granted Navas' habeas petition and ordered the INS to adjudicate Navas' application for § 212(c) relief under pre-AEDPA standards. See id. at 182. The INS appealed to this Court. See Navas v. Reno, Docket No. 97-2600.
 
 
 12
 In addition to filing his habeas petition in the district court, Navas also filed a petition for direct review of the BIA's March 14, 1997, decision with this Court on April 11, 1997. See Navas v. Reno, Docket No. 97-4070. These cases have been consolidated on appeal and are both before us today.
 
 C. Guillermo Mojica
 
 13
 Guillermo Mojica, a citizen of Colombia, has been a LPR of the United States since 1972. His wife is a naturalized citizen, and his two children have citizenship by virtue of their birth in this country. Mojica was charged in 1988 with conspiracy to distribute cocaine in violation of federal law. He pled guilty, was sentenced to one year in prison, and, on completion of his term in early 1990, was released.
 
 
 14
 In January, 1996, while returning from a brief trip to Ecuador to visit family, Mojica disclosed his conviction to border officials. He was detained overnight at John F. Kennedy International Airport and paroled into the country the next morning. The INS seized his passport and green card and told him to report to the INS on February 12, 1996. On May 29, 1996, the INS officially admitted him into the country, but immediately thereafter began deportation proceedings against him.[5] Mojica was taken into INS custody and transferred from New York to the INS holding facility in Oakdale, Louisiana on June 5, 1996.
 
 
 15
 Mojica's next appearance before an IJ was on July 5, 1996, in Louisiana. His attorney in New York appeared by telephone from Brooklyn and requested a change of venue to New York, which was denied. The case was adjourned until August 2, 1996, when Mojica conceded deportability and requested a § 212(c) waiver. On that same date, the IJ denied relief on the grounds that Mojica was statutorily ineligible for such relief because of § 440(d) of the AEDPA, and ordered him deported. Mojica appealed to the BIA, and lost.
 
 
 16
 Released on bond on October 21, 1996, Mojica, with the INS's permission, returned home to New York. He then filed a habeas petition in the United States District Court for the Eastern District of New York on March 4, 1997. The next day, the INS ordered him to surrender to their agents in Oakdale, Louisiana, which he did.
 
 
 17
 Mojica's case was consolidated with the case of Saul Navas before Judge Weinstein, who granted Mojica's habeas petition. See Mojica, 970 F.Supp. at 182. The INS appealed.
 
 D. Engin Yesil
 
 18
 Engin Yesil, a native of Turkey, arrived in this country in 1979 on a student visa at the age of sixteen. In 1987, he married a United States citizen, and the following year applied for LPR status.
 
 
 19
 In 1990, Yesil pled guilty to aiding and abetting the distribution of cocaine in violation of federal law. He was sentenced to six years' imprisonment, a three-year special parole term, and a $150,000 fine. In lieu of forfeiting his business (the eyewear distributor Lens Express), he paid $25,000.
 
 
 20
 Yesil was initially held at the Federal Correctional Institution ("FCI") in Tallahassee, Florida, but at some point was transferred to the FCI at Oakdale, Louisiana. While he was still incarcerated, the INS commenced deportation proceedings against him in Louisiana on January 5, 1994. Shortly thereafter, Yesil was transferred from the FCI to the INS's Oakdale detention facility. He was released on bond on April 12, 1994, and told the INS that he would be living in New York City. On April 15, 1994, his attorney moved to change the venue of his deportation proceedings from Louisiana to New York, but that motion was denied.
 
 
 21
 On May 4, 1994, the IJ found Yesil deportable, and on August 31, 1994, the IJ ordered him deported. The IJ held that Yesil had failed to demonstrate eligibility for relief from deportation because he had not been a LPR for the seven years required for a § 212(c) waiver. Since--under Fifth Circuit law--Yesil had only been a LPR for six years, the IJ determined that he was statutorily barred from relief. The BIA dismissed his appeal on March 17, 1995, finding that under either Second or Fifth Circuit law, Yesil had not established the requisite seven consecutive years of lawful unrelinquished domicile necessary to make him eligible for a waiver.
 
 
 22
 On April 14, 1995, Yesil filed a petition for review of the BIA's decision in this Court, claiming that under Second Circuit law he had been a LPR for seven years. In July 1995, he voluntarily withdrew this petition pending a decision by the BIA on his motion to reopen the deportation order. One year later, on July 3, 1996, the BIA denied the motion. Accordingly, on July 23, 1996, Yesil reinstated his original petition for our review of the BIA's March 17, 1995 decision, and on August 1, 1996, he filed in this Court a petition challenging the BIA's July 3, 1996, denial of his motion to reopen.
 
 
 23
 On October 29, 1996, a motions panel of this Court granted the government's motion to dismiss Yesil's petitions for lack of subject matter jurisdiction, noting that "[t]his case is not sufficiently distinguishable from Hincapie-Nieto v. INS, 92 F.3d 27 (2d Cir.1996)." In Hincapie-Nieto, we held--on the basis of government representations that some degree of habeas review remained--that the AEDPA validly stripped the Court of Appeals of jurisdiction over petitions for direct review of BIA decisions filed by aliens convicted of specified criminal offenses. See id. at 31.
 
 
 24
 Yesil filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of New York on November 8, 1996. That court (Denny Chin, Judge ) determined that Yesil did not pose a risk of flight, and stayed his surrender to the INS in Louisiana. It ordered instead that Yesil report once a month to the INS's offices in New York.
 
 
 25
 On February 27, 1997, the district court granted Yesil's habeas petition, finding that it had jurisdiction to do so pursuant to 28 U.S.C. § 2241. See Yesil v. Reno, 958 F.Supp. 828, 836 (S.D.N.Y.1997). The court then ruled that Yesil had acquired the necessary seven years of lawful domicile required for § 212(c) relief, and that he was otherwise statutorily eligible to seek such relief. See id. at 841-43. It therefore ordered the BIA to consider his application on the merits. See id. The INS appealed.
 
 II. DISCUSSION
 A. Subject Matter Jurisdiction
 
 26
 The first question before us is the extent of the federal courts' subject matter jurisdiction to review removal orders issued by the INS against criminal aliens under the 1996 amendments to the immigration laws. We have previously found that the 1996 amendments "repealed the jurisdiction a court of appeals formerly had over petitions for review filed by aliens convicted of" certain criminal offenses. Hincapie-Nieto, 92 F.3d at 28. And we have recently stated that this repeal of jurisdiction suffers from no constitutional infirmity because the 1996 amendments left untouched the courts' jurisdiction under the general habeas statute, 28 U.S.C. § 2241. See Jean-Baptiste v. Reno, 144 F.3d 212, 219-20 (2d Cir.1998); Hincapie-Nieto, 92 F.3d at 31. We adhere to these decisions.
 
 
 27
 Today, we consider one of the issues left open in Hincapie-Nieto and Jean-Baptiste--the scope of the review available under § 2241. We conclude that, whatever the outer perimeters of such review may be, the courts have the power to address the pure questions of law presented in the instant cases.
 
 
 28
 When Congress acted in 1996, it did not write on an empty slate, but rather on one replete with century-old legal guidelines. Accordingly, to ascertain the impact of the 1996 amendments on the scope and availability of judicial review, we must examine the backdrop against which Congress has legislated.
 
 
 29
 1. Judicial Review of Executive Deportation Decisions, 1885-1952
 
 
 30
 Before 1952, judicial review of immigration decisions proceeded solely by way of the writ of habeas corpus.[6] The scope of the courts' authority to review executive officials' decisions in immigration matters in this manner was first litigated in 1885. In the case of In re Jung Ah Lung, 25 F. 141 (D.Cal.1885), aff'd sub nom. United States v. Jung Ah Lung, 124 U.S. 621, 8 S.Ct. 663, 31 L.Ed. 591 (1888), the government challenged the jurisdiction of the federal district courts to review habeas petitions filed by Chinese immigrants. The government contended that the collector of customs at the port of entry, an executive official, had final authority to determine whether aliens were excludable under the Chinese Exclusion Act and that his decisions were not reviewable by the courts. The district court rejected the government's argument that the Chinese Exclusion Act had removed its authority to grant habeas relief, stating:
 
 
 31
 Such an abrogation of the writ of habeas corpus, which has always been considered among English-speaking peoples the most sacred muniment of personal freedom, must be unmistakably declared by congress before any court could venture to withhold its benefits from any human being, no matter what his race or color.
 
 
 32
 Jung Ah Lung, 25 F. at 142-43. Noting that "[t]he right to a writ of habeas corpus is the right to have the lawfulness of the restraint to which the petitioner is subjected inquired into by the courts; to be adjudged and determined by the law of the land," the court ordered briefing by the parties on the merits of the collector's findings of fact and conclusions of law with respect to the petitioner. Id. at 143-44. The Supreme Court affirmed, holding that "[w]e see nothing in these acts which in any manner affects the jurisdiction of the courts of the United States to issue a writ of habeas corpus." Jung Ah Lung, 124 U.S. at 628-29, 8 S.Ct. 663.
 
 
 33
 Even before the Supreme Court expressly approved of the practice in Jung Ah Lung, the district courts in port cities had become quite active in granting writs of habeas corpus to Chinese immigrants. The Department of Treasury estimated that by 1885, the courts were responsible for the admission of 2,695 Chinese, approximately one-fifth of the total number of Chinese landed since the enactment of the Chinese Exclusion Laws. By 1888, at least 4,091 Chinese had petitioned the federal courts for a habeas hearing and eighty-five percent of those persons had been admitted. See Lucy E. Salyer, Laws Harsh as Tigers: Chinese Immigrants and the Shaping of Modern Immigration Law 20 (1995). The result of the courts' exercise of the habeas power was that
 
 
 34
 [t]he Chinese litigants' success increased the antagonism between the federal judges and the collector and fueled public opinion against the courts. The collector ... accused the court of interfering with his job and argued that the cases "should [not] come before the judiciary at all." Groups from the local community, incensed by the court decisions, called for the impeachment of the judges and established a committee to report on the court's actions in the Chinese cases. An examiner for the Department of Justice ... reported to the attorney general: "Two coorfinate [sic ] branches of the Government are engaged in a hostile conflict, with the people and the press on the side against the courts, accusing them openly of all manner of bargain, intrigue and corruption...."
 
 
 35
 Salyer, supra, at 20-21 (citations and endnotes omitted).
 
 
 36
 Apparently in response to these concerns, Congress attempted to restrict the availability of judicial review in its 1888 amendments to the Chinese Exclusion Act. See Act of Sept. 13, 1888, 25 Stat. 476. Section 12 of this act stated, "the collector shall ... decide all questions in dispute with regard to the right of any Chinese passenger to enter the United States, and his decision shall be subject to review by the secretary of the treasury and not otherwise." Id. § 12. As one district court explained:
 
 
 37
 The books are full of cases in which the rights of Chinese persons to enter this country have been re-examined on habeas corpus, after denials of such rights by customs officials.... It was, doubtless, in view of this unbroken line of decisions, and for the purpose of changing the law ... that congress enacted the twelfth section of the Act of September 13, 1888. With this section in force, the action of the collector, in the absence of fraud, would be conclusive and final.
 
 
 38
 United States v. Loo Way, 68 F. 475, 477 (S.D.Cal.1895), aff'd, 72 F. 688 (9th Cir.1896).
 
 
 39
 For reasons unrelated to this provision, however, the entire 1888 Act was held invalid, first by the Ninth Circuit, see United States v. Gee Lee, 50 F. 271, 273 (9th Cir.1892), and ultimately by the Supreme Court, see Li Sing v. United States, 180 U.S. 486, 488-90, 21 S.Ct. 449, 45 L.Ed. 634 (1901). Accordingly, judicial review of immigration decisions continued apace.
 
 
 40
 Shortly after the passage of the 1888 Act, a congressional joint committee on immigration began drafting what would become the Immigration Act of 1891. The committee sent representatives to the West Coast, where they learned that executive immigration officials considered meddling by the courts to be one of the most serious hindrances to their work. See U.S. Congress, Select Committee on Immigration and Naturalization, 51st Cong., 2d Sess., Chinese Immigration 272-73 (1890) (cited in Salyer, supra, at 264 n. 151). And so it came to pass that the 1891 law included a provision stating that "[a]ll decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury." Act of March 3, 1891, ch. 551, § 8, 26 Stat. 1084, 1085.
 
 
 41
 The finality provision was carried forward, with only minor changes, in subsequent immigration acts. See Heikkila v. Barber, 345 U.S. 229, 234, 73 S.Ct. 603, 97 L.Ed. 972 (1953) (citing statutes from 1903, 1907, and 1917). And as the Supreme Court later explained, "[d]uring these years," (i.e., from 1891 to 1952), "the cases continued to recognize that Congress had intended to make these administrative decisions nonreviewable to the fullest extent possible under the Constitution." Id.; see also id. at 234-35, 73 S.Ct. 603 (noting that the statutes "clearly had the effect of precluding judicial intervention in deportation cases except insofar as it was required by the Constitution").
 
 
 42
 While cognizant of the limits placed on their authority by Congress, the courts in this era continued to review--on habeas--claims by aliens that the immigration officials had acted under erroneous interpretations of the law. The first of these cases was Nishimura Ekiu v. United States, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892). The petitioner in that case was excluded from entry by customs inspectors in San Francisco. She filed a petition for a writ of habeas corpus, "and contended that the act of 1891, if construed as vesting in the [executive] officers ... exclusive authority to determine [her right to land] was in so far unconstitutional, as depriving her of liberty without due process of law; and that by the Constitution she had a right to the writ of habeas corpus." Id. at 656, 12 S.Ct. 336.
 
 
 43
 The Court responded to Nishimura Ekiu's due process argument by stating in sweeping terms that, as to aliens outside the United States, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." Id. at 660, 8 S.Ct. 663. But the Supreme Court also held that "[a]n alien immigrant, prevented from landing by any such officer claiming authority to do so under an act of Congress, and thereby restrained of his liberty, is doubtless entitled to a writ of habeas corpus to ascertain whether the restraint is lawful." Id. (emphasis added).
 
 
 44
 In other words, the alien was entitled to a judicial determination of whether the executive was "acting within powers expressly conferred by Congress." And so the Court went on to consider whether the actions of the inspector were "in conformity with the act of 1891." Id. at 663, 8 S.Ct. 663. Specifically, the Court addressed the question of whether the statutory language required the inspector to take testimony "on oath." Id. Concluding that the statute allowed, but did not require, the inspector to take testimony on oath, the Court rejected Nishimura Eiku's statutory claim on its merits. See id.
 
 
 45
 As to her claim that the customs inspector had based his decision on erroneous factual findings, the Court, in contrast to its review of the statutory interpretation issue, held that "the final determination of those facts [on which the right to land depends] may be entrusted by congress to executive officers" and that the court was therefore barred by the 1891 Act from second-guessing those findings. Id. at 660, 8 S.Ct. 663.
 
 
 46
 In Yamataya v. Fisher ("The Japanese Immigrant Case "), 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903), the Court reiterated that Congress was entitled to entrust the "enforcement of [immigration] provisions, conditions, and regulations exclusively to executive officers without judicial intervention," id. at 97, 23 S.Ct. 611, and that the 1891 Act had, in fact, invested executive officers "with the power to determine finally the facts upon which an alien's right to enter this country, or remain in it, depended," id. at 100, 23 S.Ct. 611. The Court went on, however, to consider the petitioner's claim that a treaty signed in 1895 had, by implication, altered the law that allowed the exclusion of Japanese subjects who are "paupers or persons likely to become a public charge." Id. at 97, 23 S.Ct. 611. Concluding that the provision excluding the indigent was still in effect, the court rejected the immigrant's petition. See id. at 102, 23 S.Ct. 611.
 
 
 47
 Similarly, in Gonzales v. Williams, 192 U.S. 1, 24 S.Ct. 177, 48 L.Ed. 317 (1904), the Court entertained a habeas petition brought by a Puerto Rican citizen who claimed that, although not a citizen of the United States, she was not an "alien immigrant" under the 1891 statute and was, therefore, improperly excluded. The Court agreed with the petitioner and rejected the government's interpretation of the statute. See id. at 13, 24 S.Ct. 177. As for the government's contention that judicial review was precluded by the finality provisions of the immigration laws, the Court concluded that "as Gonzales did not come within the act of 1891, the commissioner had no jurisdiction to detain and deport her by deciding the mere question of law to the contrary; and she was not obliged to resort to the Superintendent or the Secretary." Id. at 15, 24 S.Ct. 177.
 
 
 48
 The Court further expounded upon the necessity of judicial review of statutory claims in Gegiow v. Uhl, 239 U.S. 3, 36 S.Ct. 2, 60 L.Ed. 114 (1915), stating:
 
 
 49
 The statute, by enumerating the conditions upon which the allowance to land may be denied, prohibits the denial in other cases. And when the record shows that a commissioner of immigration is exceeding his power, the alien may demand his release upon habeas corpus. The conclusiveness of the decisions of immigration officers under § 25 is conclusiveness upon matters of fact. This was implied in Nishimura Ekiu v. United States. ... As was said in Gonzales v. Williams, "as Gonzales did not come within the act of 1891, the Commissioner had no jurisdiction to detain and deport her by deciding the mere question of law to the contrary." Such a case stands no better than a decision without a fair hearing, which has been held to be bad.
 
 
 50
 Id. at 9, 36 S.Ct. 2 (citations omitted).
 
 
 51
 As a result, the Court went on to consider the petitioner's claim that, under the immigration statute, he should not have been deemed an individual likely to become a public charge solely on the ground that the labor market in the city of his immediate destination was overstocked. The Court agreed with the alien and, rejecting the executive branch's interpretation of the statute, held that the statute allowed only consideration of the labor market in the country as a whole, and not in any particular city. See id. at 9-10, 36 S.Ct. 2.
 
 
 52
 Other cases of this sort abound in the reporters. See, e.g., Delgadillo v. Carmichael, 332 U.S. 388, 390-91, 68 S.Ct. 10, 92 L.Ed. 17 (1947) (granting habeas and rejecting the immigration service's interpretation of the statutory term "entry"); Bridges v. Wixon, 326 U.S. 135, 149, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (rejecting the government's interpretation of the term "affiliation" with the Communist party and holding that habeas is appropriate "where an alien is ordered deported for reasons not specified by Congress"); Kessler v. Strecker, 307 U.S. 22, 35, 59 S.Ct. 694, 83 L.Ed. 1082 (1939) (holding, on habeas, that "as the Secretary erred in the construction of the statute, the writ must be granted and the respondent discharged from custody"); Mahler v. Eby, 264 U.S. 32, 46, 44 S.Ct. 283, 68 L.Ed. 549 (1924) (rejecting, on habeas, the executive branch's interpretation of findings necessary for deportation based on espionage); Howe v. United States, 247 F. 292 (2d Cir.1917) (rejecting, in a habeas suit, the immigration authority's "latitudinarian construction of the provision 'likely to become a public charge' " (citation omitted)).
 
 
 53
 The passage in 1946 of the Administrative Procedure Act (the "APA"), with its provisions allowing courts to determine on the "whole record" whether an agency decision was supported by "substantial evidence," prompted aliens to press for broader judicial review. See APA § 10(e), 60 Stat. 243 (1946) (currently codified at 5 U.S.C. § 706) (describing the scope of judicial review under the statute). The Supreme Court rebuffed this bid in the Heikkila case. In Heikkila, the Court held that the Immigration Act of 1917--which had been consistently interpreted by the courts to have the "effect of precluding judicial intervention in deportation cases except insofar as it was required by the Constitution," thereby limiting the courts' review of facts to the narrow requirements of "due process"--was "a statute precluding judicial review" within the meaning of the APA. Heikkila, 345 U.S. at 234-35, 73 S.Ct. 603. Accordingly, the Court held that habeas review for legal defects was still the sole avenue for attacking a deportation order. See id. at 237, 73 S.Ct. 603.
 
 2. Immigration Act of 1952
 
 54
 The Immigration and Nationality Act of 1952, Pub.L. No. 82-414, 66 Stat. 163, was Congress' "first attempt to bring within one cohesive and comprehensive statute the various laws relating to immigration, naturalization, and nationality." H.R.Rep. No. 82-1365 (1952), reprinted in 1952 U.S.C.C.A.N. 1653, 1952 WL 3082, at * 24. The committee report on the 1952 Act expressed the understood implication of the Supreme Court decisions described above, namely that "[t]he power and authority of the United States, as an attribute of sovereignty, either to prohibit or regulate immigration of aliens are plenary and Congress may choose such agencies as it pleases to carry out whatever policy or rule of exclusion it may adopt, and, so long as such agencies do not transcend limits of authority or abuse discretion reposed in them, their judgment is not open to challenge or review by courts." Id. at * 2 (emphasis added) (citing Yamataya v. Fisher, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903)). Similarly, a committee report for a predecessor bill expressed Congress' understanding of the constitutional backdrop as established by the case law, namely that:
 
 
 55
 Once the order and warrant of deportation are issued, the administrative process is complete. Under the fifth amendment to the Constitution, the "due process" provision, the alien may, however, petition for a writ of habeas corpus. In a habeas corpus proceeding, based on a deportation case, the court determines whether or not there has been a fair hearing [and] whether or not the law has been interpreted correctly . ...
 
 
 56
 S. Rep. No. 1515, 81st Cong., 2d Sess., at 629 (1950) (quoted in Shaughnessy v. Pedreiro, 349 U.S. 48, 56, 75 S.Ct. 591, 99 L.Ed. 868 (1955) (Minton, J., dissenting)) (emphasis added).
 
 
 57
 Although the 1952 Act also contained a finality provision, this provision was held by the Supreme Court not to preclude direct judicial review of INS decisions under the APA. See Shaughnessy, 349 U.S. at 51-52, 75 S.Ct. 591 (citing legislative history indicating that Congress intended APA review to be available under the 1952 Act). Accordingly, the scope of review of immigration decisions--particularly executive factual findings--was substantially broadened by the 1952 Act. See Heikkila, 345 U.S. at 236 & n. 11, 73 S.Ct. 603 (contrasting the due process "some evidence" test applied on habeas in, e.g., Bridges v. Wixon, 326 U.S. 135, 149, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), with the APA test of "substantial evidence" on the "record as a whole").
 
 
 58
 3. Immigration and Naturalization Act of 1961
 
 
 59
 Soon after, the government became worried that aliens were taking advantage of the availability of APA review by filing duplicative petitions for habeas and direct review, thereby delaying their departures. President Eisenhower expressed this concern in special messages to Congress, stating that "the growing frequency of ... cases brought for purposes of delay, particularly those involving aliens found to be criminals and traffickers in narcotics and subversion, makes imperative the need for legislation limiting and carefully defining the judicial process." Letter from President Eisenhower to Congress, Jan. 31, 1957, H. Doc. No. 85, 85th Cong., 1st Sess. (quoted in H.R.Rep. No. 87-1086 (1961), reprinted in 1961 U.S.C.C.A.N. 2950, 1961 WL 4841, at * 20) ("Letter of Jan. 31, 1957"). At the same time, President Eisenhower stated that "Constitutional due process wisely confers upon any alien, whatever the charge, the right to challenge in the courts the Government's finding of deportability." Presidential Message of Feb. 8, 1956, H. Doc. No. 329, 84th Cong., 2d Sess. (quoted in H.R.Rep. No. 87-1086 (1961), reprinted in 1961 U.S.C.C.A.N. 2950, 1961 WL 4841, at * 21); see also Letter of Jan. 31, 1957, at * 20 ("Whatever the ground for deportation, any alien has the right to challenge the Government's findings of deportability through judicial process. This is as it should be."). And so President Eisenhower urged that new legislation be enacted that would preserve judicial review but would limit the ability of aliens to file repetitious petitions in the courts. See Letter of Jan. 31, 1957, at * 20.
 
 
 60
 The Immigration and Naturalization Act was amended by the Act of Sept. 26, 1961, Pub.L. No. 87-301, § 5, 75 Stat. 650, 651-53. This Act was "in accord" with former President Eisenhower's recommendations in this regard and was supported by the new Kennedy administration. See H.R.Rep. No. 87-1086 (1961), reprinted in 1961 U.S.C.C.A.N. 2950, 1961 WL 4841, at * 21. The Act created a "single, separate, statutory form of judicial review of administrative orders for the deportation and exclusion of aliens from the United States." Id. at * 19. Primary jurisdiction to review final orders of deportation was vested in the courts of appeals. See 8 U.S.C. § 1105a (repealed 1996). The scope of this review was substantially the same as that provided by the APA, and so was broader than that allowed under the Heikkila-era habeas cases. Aliens facing exclusion rather than deportation were left with the sole remedy of a habeas corpus suit. See id. In addition, the law provided that aliens held "in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings." Id. The law also placed time barriers on the filing of petitions for judicial review and limited repetitious petitions. See id.
 
 4. The 1996 Amendments
 
 61
 In 1996, Congress enacted two bills that significantly altered the immigration laws. The first, the AEDPA, took effect on April 24, 1996. Sections 401(e) and 440(a) of the AEDPA struck 8 U.S.C. § 1105a(a)(10), the section that had previously provided for habeas review for aliens held in custody pursuant to deportation orders, and replaced it with the following new text: "Any final order of deportation against an alien who is deportable by reason of having committed [certain crimes] shall not be subject to review by any court." AEDPA § 440(a), 110 Stat. at 1276.
 
 
 62
 Congress undertook a more ambitious reform of the immigration laws a few months later. The product of this effort, the IIRIRA, took effect on September 30, 1996. The IIRIRA contains two sets of provisions. The permanent changes govern removal proceedings commenced after April 1, 1997. See IIRIRA § 309(a). The transitional provisions (which are not codified in the U.S.Code) control deportation proceedings started prior to April 1, 1997, in which the deportation order became administratively final after October 30, 1996. (Deportation orders that became final before October 30, 1996, are not affected by the IIRIRA and are governed by the 1961 Immigration Act--as amended, of course, by the AEDPA.) The cases before us are governed by the rules in effect during the IIRIRA transitional period. Section 309(c)(4)(G) of the IIRIRA transitional rules is the immediate successor to AEDPA § 440(a), and reiterated and expanded its overhaul of former 8 U.S.C. § 1105a(a)(10). It provides that "[t]here shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed a criminal offense covered in [certain sections of the code]." IIRIRA § 309(c)(4)(G).[7]5. Effect of the 1996 Amendments
 
 
 63
 The 1996 amendments were clearly meant to constrict the availability of judicial review of deportation orders against criminal aliens. But how far did Congress intend to go? As noted above, we have previously found that the 1996 amendments "repealed the jurisdiction a court of appeals formerly had over petitions for review filed by aliens convicted of [certain criminal offenses]." Hincapie-Nieto, 92 F.3d at 28. And we have joined our sister circuits in concluding that this repeal of jurisdiction suffers from no constitutional infirmity because the courts retain habeas jurisdiction under 28 U.S.C. § 2241. See Jean-Baptiste, 144 F.3d at 220; Hincapie-Nieto, 92 F.3d at 31; see also Goncalves v. Reno, 144 F.3d 110, 123 (1st Cir.1998); Mansour v. INS, 123 F.3d 423, 426 (6th Cir.1997); Turkhan v. INS, 123 F.3d 487, 489-90 (7th Cir.1997); Williams v. INS, 114 F.3d 82, 83-84 (5th Cir.1997); Ramallo v. Reno, 114 F.3d 1210, 1214 & n. 1 (D.C.Cir.1997), petition for cert. filed, 66 U.S.L.W. 3264 (Sept. 24, 1997) (No. 97-526); Fernandez v. INS, 113 F.3d 1151, 1154-55 (10th Cir.1997); Salazar-Haro v. INS, 95 F.3d 309, 311 (3d Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1842, 137 L.Ed.2d 1046 (1997).[8]
 
 
 64
 In Jean-Baptiste, we emphasized that although "Congress exercises broad power over immigration matters," that power is limited by the Constitution. Jean-Baptiste, 144 F.3d at 219 (citing INS v. Chadha, 462 U.S. 919, 940-41, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) ("Congress has plenary authority in all cases in which it has substantive legislative jurisdiction, ... so long as the exercise of that authority does not offend some other constitutional restriction." (internal quotation marks and citations omitted))); see generally Battaglia v. General Motors Corp., 169 F.2d 254, 257 (2d Cir.1948) ("[W]hile Congress has the undoubted power to give, withhold, and restrict the jurisdiction of the courts ..., it must not so exercise that power as to deprive any person of life, liberty, or property without due process of law...."); Henry M. Hart, Jr., The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L.Rev. 1362, 1397 (1953) (positing constitutional limits on Congress' control of federal court jurisdiction); Lawrence Gene Sager, The Supreme Court, 1980 Term--Foreword: Constitutional Limitations on Congress' Authority to Regulate the Jurisdiction of the Federal Courts, 95 Harv. L.Rev. 17, 42 (1981) (same).
 
 
 65
 We noted in Jean-Baptiste that the Constitution provides that " '[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.' " Jean-Baptiste, 144 F.3d at 218 (quoting U.S. Const., art. I, § 9, cl. 2). And we further stated that "in the absence of language affirmatively and clearly eliminating habeas review, we presume Congress did not aim to bar federal courts' habeas jurisdiction pursuant to § 2241." Id. at 219 (citing Felker, 518 U.S. at 661, 116 S.Ct. 2333, and Ex parte Yerger, 75 U.S. (8 Wall.) 85, 105, 19 L.Ed. 332 (1868)).
 
 
 66
 The decision in Jean-Baptiste reflects the well-accepted rule of statutory construction that repeals by implication of jurisdictional statutes (and particularly of the habeas statutes) are disfavored. In addition, it acknowledges the presumption in favor of judicial review. See, e.g., Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986) ("We begin with the strong presumption that Congress intends judicial review of administrative action."); see also Webster v. Doe, 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (same); Johnson v. Robison, 415 U.S. 361, 373-74, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) (same). Finally, it avoids the profound constitutional questions that would be presented under the Suspension Clause, Article III, the Due Process Clause, and the Equal Protection Clause if the statute were read to preclude all judicial review. See generally Note, The Avoidance of Constitutional Questions and Preservation of Judicial Review: Federal Court Treatment of the New Habeas Provisions, 111 Harv. L.Rev. 1578, 1579, 1589-90 (1998).
 
 
 67
 Indeed, the government itself does not argue that the 1996 amendments completely forbid judicial review of deportation against criminal aliens. Rather, the government disputes our conclusion in Jean-Baptiste that the proper mechanism for such review is through a petition for a writ of habeas corpus in the district courts rather than by direct review in the courts of appeals. In addition, the government contends that the scope of review--wherever available--is quite narrow. In its view, the courts are only empowered to examine petitions presenting "substantial" or "colorable" constitutional claims, and not petitions involving "mere" questions of statutory law.
 
 
 68
 With respect to the government's first argument, our response is that the panel in Jean-Baptiste considered and rejected the contention that the 1996 laws channel all claims through the courts of appeals. See Jean-Baptiste, 144 F.3d at 218. As a result, we are bound by Jean-Baptiste. See, e.g., Jones v. Coughlin, 45 F.3d 677, 679 (2d Cir.1995) ("A decision of a panel of this Court is binding unless and until it is overruled by the Court en banc or by the Supreme Court.").[9]
 
 
 69
 As for the government's second argument, we note that the opinion in Jean-Baptiste expressly left open the question of the extent of review available under § 2241. See Jean-Baptiste, 144 F.3d at 220. We agree with the government that the scope of that review is considerably narrower than the review that was available prior to the 1996 amendments. Indeed, we concur with the government's assertion in one of its briefs that "the law now is much like it was prior to enactment of the INA" and is similar to that which existed under the early statutes that were " 'intended to make these administrative decisions nonreviewable to the fullest extent possible under the Constitution.' " Brief for Respondents-Appellants Janet Reno, et al., Mojica v. Reno, No. 97-2599, 97-2600, at 32 (quoting Heikkila, 345 U.S. at 234, 73 S.Ct. 603).
 
 
 70
 But, precisely because review has been reduced to that which remained constitutionally mandated for nearly a century despite the existence of the early statutes, we disagree with the government's contention that the courts are without power to review the Attorney General's interpretation of the immigration laws. Instead, we concur with the First Circuit (and Judges Weinstein and Chin) that the questions presented by these aliens are properly within the scope of the habeas corpus jurisdiction of the federal courts.[10] See Goncalves, 144 F.3d at 125; see also Richard H. Fallon, Jr., Applying the Suspension Clause to Immigration Cases, 98 Colum. L.Rev. 1068, 1092-97 (1998).
 
 
 71
 As the First Circuit explained, "the Attorney General's formulation of the standard of constitutionally-compelled review is drawn from the very different context of successive federal habeas corpus petitions by prisoners in state custody who have already had one or more opportunities for full judicial process and appeals in the state system, with an opportunity for further review in the Supreme Court by a writ of certiorari, and one or more opportunities for review in the federal judiciary on their first habeas petition." Goncalves, 144 F.3d at 118 n. 8. The cases before us arise instead in the totally dissimilar setting of executive detention, a context in which the petitioners have never had their claims reviewed by any court, federal or state.[11]
 
 
 72
 As a result, the Attorney General's contention must be that no court has the power to review her interpretation of the immigration laws.[12] But this position is, to put it mildly, not only at war with the historical record described earlier in this opinion--for at least a hundred years, the courts have reviewed the executive branch's interpretation of the immigration laws, and have deemed such review to be constitutionally mandated--it is also hard to square with the core conception of habeas corpus as it has been applied over many centuries.
 
 
 73
 The primary historical use of the writ of habeas corpus was precisely against executive detention. See Felker, 518 U.S. at 663, 116 S.Ct. 2333 (noting that the writ originally only extended to prisoners in federal custody who were not "detained in prison by virtue of the judgment of a court" (citation and internal quotation marks omitted)); Swain v. Pressley, 430 U.S. 372, 380 n. 13, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977); id. at 385-86, 97 S.Ct. 1224 (Burger, C.J., concurring) (joined by Blackmun and Rehnquist, JJ.) ("Under this view of the case, I need not consider the important constitutional question whether the Suspension Clause protects the jurisdiction of the Art. III courts. A doctrine that allowed transfer of the historic habeas jurisdiction to an Art. I court could raise separation-of-powers questions, since the traditional Great Writ was largely a remedy against executive detention."); Brown v. Allen, 344 U.S. 443, 533, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (Jackson, J., concurring in the result) ("[T]he historic purpose of the writ has been to relieve detention by executive authorities without judicial trial.").
 
 
 74
 Thus, at common law, "[w]hile habeas review of a court judgment was limited to the issue of the sentencing court's jurisdictional competency, an attack on an executive order could raise all issues relating to the legality of the detention." Developments in the Law--Federal Habeas Corpus, 83 Harv. L.Rev. 1038, 1238 (1970) (emphasis added); see also Ex parte Randolph, 20 F. Cas. 242, 254 (C.C.D.Va.1833) (Marshall, Circuit Justice ) (granting habeas relief to an individual held in custody by an executive official and stating that executive officials "cannot act on other persons, or on other subjects, than those marked out in the power [granted by statute], nor can they proceed in a manner different than it prescribes" and that the legislation in question "ought, in its construction, [be] strictly confined to its letter"); Paul Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L.Rev. 441, 463-69 (1963) (noting that the traditional writ of habeas corpus was commonly used in England and the early United States to correct extra-judicial detention of prisoners by the executive, or to challenge the jurisdiction of a rendering court).
 
 
 75
 Not surprisingly, the practice of the federal courts in immigration cases between 1885 and 1952 reflected this historic understanding. Thus, in the immigration context, review of statutory questions was deemed essential to ensuring due process of law. See, e.g., Gegiow, 239 U.S. at 3, 36 S.Ct. 2 ("The statute, by enumerating the conditions upon which the allowance to land may be denied, prohibits the denial in other cases. And when the record shows that a commissioner of immigration is exceeding his power, the alien may demand his release upon habeas corpus."); see also Brownell v. We Shung, 352 U.S. 180, 182 n. 1, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956) (holding that "due process" guarantees enforceable on habeas include "conformity to statutory grounds"); Goncalves, 144 F.3d at 124 ("[N]umerous immigration cases under the § 2241 jurisdiction have considered claims of statutory right, sometimes described as an integral part of ensuring due process of law."); Hart, supra, at 1393 n. 93 ("[S]ince the courts in habeas corpus have always enforced statutory requirements," the Supreme Court in Heikkila "must be understood as saying that the Constitution gives the alien a right, among others, to have the statutes observed.").[13]
 
 
 76
 Indeed, for all its talk of "substantial" constitutional claims, the government acknowledges that review must be available for some statutory questions, such as whether the petitioner is in fact an alien under applicable laws,[14] and whether he or she has been convicted of crimes that render him or her deportable within the meaning of the statute. See Brief for Respondents-Appellants at 29, Mojica, Nos. 97-2599, 97-2600 (citing Yang v. INS, 109 F.3d 1185, 1189 (7th Cir.1997)).
 
 
 77
 Accordingly, we hold that the federal courts have jurisdiction under § 2241 to grant writs of habeas corpus to aliens when those aliens are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241.[15] This is not to say that every statutory claim that an alien might raise is cognizable on habeas. But those affecting the substantial rights of aliens of the sort that the courts have secularly enforced--in the face of statutes seeking to limit judicial jurisdiction to the fullest extent constitutionally possible--surely are. The two statutory questions before us today are clearly of this variety, and the district courts had subject matter jurisdiction to consider them.
 
 B. Personal Jurisdiction
 
 78
 Before we turn to the merits of petitioners' claims, however, we must address issues of personal jurisdiction. Two of the petitioners (Yesil and Mojica) have cited both the Attorney General of the United States and John B. Caplinger, the INS District Director in New Orleans, Louisiana as respondents. But the government contends that Caplinger is the only legitimate respondent for habeas purposes and further asserts that Caplinger is outside of the New York district courts' personal jurisdiction. For reasons we discuss below, we decline at this time to decide whether the Attorney General could appropriately be cited as custodian in these cases, and we concentrate instead on the government's contentions with respect to Caplinger.[16]
 
 
 79
 A court has personal jurisdiction in a habeas case "so long as the custodian can be reached by service of process." Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 495, 499, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973) (holding that a district court in Kentucky had personal jurisdiction over a case filed by an inmate in Alabama). Section 2243 of Title 28 provides that the writ of habeas corpus "shall be directed to the person having custody of the person detained," but does not specify who the proper custodian is. 28 U.S.C. § 2243 (1994). Historically, the question of who is "the custodian," and therefore the appropriate respondent in a habeas suit, depends primarily on who has power over the petitioner and, as we will discuss below, on the convenience of the parties and the court.
 
 
 80
 In general, courts have treated the individual with day-to-day control over the petitioner as the custodian for habeas purposes. See, e.g., Guerra v. Meese, 786 F.2d 414, 416 (D.C.Cir.1986); Billiteri v. United States Bd. of Parole, 541 F.2d 938, 948 (2d Cir.1976). This rule "is a practical one based on common sense administration of justice." Sanders v. Bennett, 148 F.2d 19, 20 (D.C.Cir.1945). And for the great majority of habeas cases, which involve prisoners held in penal institutions, the rule made sense, and still does. The person with immediate control over the prisoner has the literal power to "produce" the body and is generally located in the same place as the petitioner, thereby simplifying venue problems.
 
 
 81
 Although petitioners Yesil and Mojica are not currently confined in Louisiana, Caplinger, the INS District Director in New Orleans, exercises primary custody over them, since they are both seeking to be released from the detainers lodged against them by the INS at its Oakdale, Louisiana, facility. For this reason, the government contends, Caplinger is the only appropriate respondent to a habeas petition brought by either Yesil or Mojica. The government further asserts that, because District Director Caplinger does not have contacts with the State of New York that are sufficient to render him subject to the New York long-arm statute, Mojica and Yesil's habeas petitions may not proceed in the Eastern and Southern Districts of New York.
 
 
 82
 The question of whether the New York long-arm statute reaches District Director Caplinger, however, is highly complicated. "Personal jurisdiction of a federal court over a non-resident defendant is governed by the law of the state in which the court sits--subject, of course, to certain constitutional limitations of due process." Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir.1994); see also Fed.R.Civ.P. 4(e)(1) (permitting service of process pursuant to the applicable rules of the state in which a federal district court sits). And under New York law, personal jurisdiction lies over any non-resident who, in person or through an agent, "transacts any business within the state." N.Y. C.P.L.R. § 302(a)(1) (McKinney 1990).
 
 
 83
 More specifically, to gain the benefit of the New York long-arm statute, the petitioners must demonstrate that District Director Caplinger " 'purposefully avail[ed] himself of the privilege of conducting activities within New York' " (thus satisfying due process concerns), and that the petitioners' causes of action " 'ar[o]se out of' " his activities within the state. Kronisch v. United States, 150 F.3d 112, 130 (2d Cir.1998) (quoting CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir.1986) (internal punctuation omitted)); accord Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 466, 522 N.E.2d 40, 43, 527 N.Y.S.2d 195, 198-99 (1988); McGowan v. Smith, 52 N.Y.2d 268, 271-72, 419 N.E.2d 321, 322-23, 437 N.Y.S.2d 643, 644-45 (1981). A suit will be deemed to have arisen out of a party's activities in New York if there is " 'an articulable nexus,' or a 'substantial relationship,' between the claim asserted and the actions that occurred in New York." Kronisch, 150 F.3d at 130 (citing Kreutter, 71 N.Y.2d at 466, 522 N.E.2d at 43, 527 N.Y.S.2d at 198-99; McGowan, 52 N.Y.2d at 271-72, 419 N.E.2d at 322-23 437 N.Y.S.2d at 645).
 
 
 84
 The courts below each found that personal jurisdiction could properly be asserted over District Director Caplinger. See Mojica, 970 F.Supp. at 165-66; Yesil, 958 F.Supp. at 835-36.
 
 
 85
 In Yesil's case, the district court found that Director Caplinger "ha[d] purposefully thrust himself into the Southern District of New York." Yesil, 958 F.Supp. at 835. To begin with, the court noted that the INS was well aware of Yesil's plans to return to New York City once he was released on bond. And, after his return, INS officials in Louisiana engaged in negotiations over an increase in the bond amount with Yesil's counsel, who was located in New York. Subsequently, District Director Caplinger sent two letters to New York--one to Yesil's counsel confirming the increased bond amount, and one to Yesil directing him to surrender to INS officials in Louisiana. The government also sought Yesil's surrender in the proceedings before the district court and, as a condition of the court's stay of his surrender, requested that Yesil be directed to report regularly both in person and by telephone to the INS offices in New York City. The composite of these factors led the district court to conclude that District Director Caplinger properly fell within the ambit of the New York long-arm statute. See id. at 835-36.
 
 
 86
 In Mojica's case, the district court found that the petitioner, who had lived in Queens, New York, ever since he came to the United States in 1972, was only transferred to the INS' Oakdale detention facility in Louisiana after he had been taken into custody by the INS in its New York City offices and placed in the INS' New York detention facility. See Mojica, 970 F.Supp. at 141-42. The district court also noted that Mojica's New York attorney had taken part in a telephonic bond hearing with officials at Oakdale to secure his client's release. Bond having been arranged, Mojica returned home to New York with Caplinger's full knowledge. Subsequently, District Director Caplinger sought Mojica's surrender pending the resolution of his habeas petition and ordered him to return to Oakdale (using the government's New Yorkbased attorneys to implement and enforce a deportation order against him). These actions were collectively deemed by the district court to satisfy the New York long-arm statute. See id. at 166.[17]
 
 
 87
 The district courts may have been correct that Director Caplinger "purposefully availed" himself of the privilege of conducting business in New York, but we cannot say so with sufficient confidence to affirm their holdings in this regard. The issue of what level of contacts suffices to invoke New York's long-arm statute is a recurring one in immigration habeas cases brought in federal district courts located in the State of New York. It also raises complicated questions of first impression regarding the interpretation and application of New York state law in the immigration context. Under these circumstances, we believe it appropriate to do what the district courts could not,[18] and seek guidance on the matter from the one court that can definitively interpret New York law. Accordingly, we will, by separate order, certify this issue in both Yesil and Mojica's cases to the New York Court of Appeals.
 
 
 88
 If the New York Court of Appeals determines that District Director Caplinger's actions bring him within the reach of the New York long-arm statute, the issue of whether the Attorney General would be an appropriate alternative respondent in alien habeas cases will be mooted.[19] The Supreme Court has shown a marked reluctance to resolve the latter question, see Ahrens v. Clark, 335 U.S. 188, 193, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948) (expressly leaving the question open), and the issue is one on which the lower courts have split, compare Nwankwo v. Reno, 828 F.Supp. 171, 176 (E.D.N.Y.1993) (holding in a habeas suit that the Attorney General was a proper respondent), with Yi v. Maugans, 24 F.3d 500, 507 (3d Cir.1994) (stating that the Attorney General is not a proper respondent). It is, moreover, as a short discussion will indicate, a highly complex issue that we ought not decide unnecessarily.
 
 
 89
 While, as noted earlier, the custodian for habeas purposes has generally been the party in direct control of the petitioners, it is also true that the concept of "in custody" for habeas purposes has broadened in recent years. See Billiteri, 541 F.2d at 948. This appears to have occurred, at least in part, because of increasing practical problems that allegedly attach to the traditional approach. As a result of these concerns, the rules treating the immediate custodian as the only proper respondent and that person's situs as the sole correct venue have not been applied consistently or in a rigid fashion.
 
 
 90
 Thus, practical concerns led Congress, in 1948, to enact 28 U.S.C. § 2255, and to make it the main provision governing collateral attacks on convictions by federal prisoners. Prior to the 1948 enactment, federal courts had encountered numerous difficulties, which arose from the fact that
 
 
 91
 the few District Courts in whose territorial jurisdiction major federal penal institutions are located were required to handle an inordinate number of habeas corpus actions far from the scene of the facts, the home of the witnesses and the records of the sentencing court solely because of the fortuitous concentration of federal prisoners within the district.
 
 
 92
 United States v. Hayman, 342 U.S. 205, 213-14, 72 S.Ct. 263, 96 L.Ed. 232 (1952) (discussing the legislative history of § 2255). To alleviate these problems, Congress enacted *125s 2255, which provides (a) that federal prisoners should mount their collateral attacks in the judicial districts where they were originally sentenced, and (b) that the United States should be the appropriate respondent in such suits. See Braden, 410 U.S. at 497, 93 S.Ct. 1123 ("[A] critical part of the congressional purpose [was] to avoid the vastly disproportionate burden of handling habeas corpus petitions which had fallen, prior to the amendments, on those districts in which large numbers of prisoners [were] confined.").
 
 
 93
 Similarly, one of the rules governing § 2254, which applies to habeas petitions that challenge state government actions, provides that an applicant "not presently in custody pursuant to the state judgment against which he seeks relief but may be subject to such custody in the future" should name as respondents both "the officer having present custody of the applicant and the attorney general of the state in which the judgment which he seeks to attack was entered." Rule 2(b), Rules Governing 28 U.S.C. § 2254. The notes to this rule explain that "[t]his is appropriate because no one will have custody of the petitioner in the state of the judgment being attacked, and the habeas corpus action will usually be defended by the attorney general." Advisory Comm. Note to Rule 2(b), Rules Governing 28 U.S.C. § 2254. In addition, the notes state that in a § 2254 case, "the judge may require or allow the petitioner to join an additional or different party as a respondent if to do so would serve the ends of justice." Id.
 
 
 94
 Like these statutes, the case law also reflects a preference for a practical approach to such issues. In Ex parte Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243 (1944), for instance, the Supreme Court considered a habeas petition filed by an American citizen of Japanese ancestry held in an internment camp by the War Relocation Authority. Endo was originally detained in Northern California, and so she filed her suit in the United States District Court for the Northern District of California. Although the government's lawyers opposed the petition, no respondent was ever served with process or appeared in court. See id. at 305, 65 S.Ct. 208. While the suit was pending, the government transferred Endo to Utah. See id. at 304, 65 S.Ct. 208. The Supreme Court held that the Northern District of California nonetheless retained jurisdiction over the case, and ordered that court to grant the writ. See id. at 305-07, 65 S.Ct. 208. The High Court reasoned that either the Acting Secretary of the Interior or the assistant director whose office was in San Francisco could act as the respondent, for both were within the jurisdiction of the Northern District of California and each had the power to order the release of the petitioner, despite the fact that she was now in Utah. See id. at 304-05, 65 S.Ct. 208. Subsequently, relying on Endo, the Seventh Circuit held, in a case very much like the ones before us today, that it retained jurisdiction over an alien's habeas petition even after the INS had transferred the alien to another state. See United States ex rel. Circella v. Sahli, 216 F.2d 33, 37 (7th Cir.1954).
 
 
 95
 In Strait v. Laird, 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972), the Supreme Court took a similarly flexible approach (albeit in another context). In that case, the Court allowed an army reservist's habeas suit to proceed in California, where he lived, despite the fact that his nominal custodian was in Indiana. The Court warned that it would be inappropriate to "exalt fiction over reality" in determining who Strait's custodian was and what the proper venue for the suit should be. Id. at 344, 92 S.Ct. 1693. The Court noted that Strait's "nominal custodian [in Indiana] ... has enlisted the aid and directed the activities of armed forces personnel in California in his dealings with Strait." Id. And the Court concluded that "[t]he concepts of 'custody' and 'custodian' are sufficiently broad to allow us to say that the commanding officer in Indiana, operating through officers in California in processing petitioner's claim, is in California for the limited purposes of habeas corpus jurisdiction." Id. at 346, 92 S.Ct. 1693 (emphasis added).
 
 
 96
 Beyond the increasing appreciation for practical concerns, demonstrated in the above cases, additional factors relating to the unique role that the Attorney General plays in immigration matters may be taken to suggest that she may be a proper respondent in alien habeas cases. Congress has consistently designated the Attorney General as the legal custodian of the petitioners. See, e.g., 8 U.S.C. § 1226(e)(1) ("The Attorney General shall take into custody any alien who [is deportable or inadmissible because of criminal convictions].") (Supp.1998); accord Ahrens v. Clark, 335 U.S. 188, 199, 68 S.Ct. 1443, 92 L.Ed. 1898 (1948) (Rutledge, J., dissenting).[20] Similarly, the Attorney General is named as proper respondent in most court actions reviewing the legality of removal orders. See 8 U.S.C. § 1252(b)(3)(A) (Supp.1998) (setting forth that, in petitions for review, "[t]he respondent is the Attorney General").
 
 
 97
 There is also no question that the Attorney General has the power to produce the petitioners, remains the ultimate decisionmaker as to matters concerning the INS, see 8 U.S.C. § 1103(a)(1), and is commonly designated a respondent in these cases, even when personal jurisdiction over the immediate custodian clearly lies.[21] In this respect, the extraordinary and pervasive role that the Attorney General plays in immigration matters is virtually unique. Thus, the Attorney General continues to be "in complete charge of the proceedings leading up to the order directing the[ ] removal [of aliens] from the country" and has "complete discretion to decide whether or not removal shall be directed." Ahrens, 335 U.S. at 199, 68 S.Ct. 1443 (Rutledge, J., dissenting); see also Guzman v. Tippy, 130 F.3d 64, 65-66 (2d Cir.1997) (per curiam ) (noting that the Attorney General possesses the authority to detain excludable aliens indefinitely and also in her discretion to parole temporarily aliens into the United States for humanitarian or significant public benefit reasons (citing 8 U.S.C. § 1182(d)(5)(A) (Supp.1997))).
 
 
 98
 Moreover, circumstances foreseen by this court in Billiteri further indicate that the Attorney General may be an appropriate respondent at least in the peculiar context of the cases before us. It is, after all, as a direct result of the intervention of the Attorney General in Soriano II that these aliens are now bringing the instant habeas petitions.[22] The aliens before us are, therefore, not only in the statutory custody of the Attorney General and subject to her virtual day-to-day control, but they are also where they are because of actions she herself has taken.
 
 
 99
 Nevertheless, there are also strong arguments to be made against deeming the Attorney General to be an appropriate respondent in alien habeas cases. The Attorney General is designated, pursuant to statute, as the custodian of all federal prisoners, see 18 U.S.C. § 4001 (1994), yet no one seriously suggests that she is a proper respondent in prisoner habeas cases. Moreover, it is undoubtedly District Director Caplinger who exercises primary custody over the petitioners and who has lodged a detainer against them in Louisiana. Furthermore, Billiteri appears to bar the designation of a higher authority (in that case, the parole board) as a custodian when a habeas petitioner is under the day-to-day control of another custodian (such as the prison warden). See Billiteri, 541 F.2d at 948 ("[I]t would stretch the meaning of the term beyond the limits thus far established by the Supreme Court to characterize the Parole Board as the 'custodian' of a prisoner who is under the control of a warden and confined in a prison, and who is seeking, in a habeas corpus action, to be released from precisely that form of confinement.").[23]
 
 
 100
 On a doctrinal basis, therefore, the question of whether the Attorney General is an appropriate respondent in alien habeas cases, is not one that is readily decided. The same is true if one turns to issues of convenience and venue. In this regard, two factors--the overloading of federal courts in a limited number of jurisdictions and the danger of jurisdiction shopping--are particularly important.
 
 
 101
 Petitioners argue that both factors support a holding that the Attorney General is a proper respondent. They cite the district court in Nwankwo to the effect that the government could "seriously undermine the remedy of habeas corpus by detaining illegally a large group of persons in one facility so that the resulting 'torrent of habeas corpus petitions' would overwhelm the district and magistrate judges of the local United States District Court." 828 F.Supp. at 174; see also Strait v. Laird, 406 U.S. at 345, 92 S.Ct. 1693 (expressing the desirability of avoiding the "concentration of similar cases in the district" in which the reserve officers personnel office was located).
 
 
 102
 And, while we make no suggestion whatsoever that this kind of overloading has occurred by design, there can be no doubt that it has actually come about in Louisiana due to the high concentration of persons detained at the INS' Oakdale facility. As the Fifth Circuit has observed, "the inundated district and magistrate judges of the Western District of Louisiana are toiling long and hard to process the torrent of habeas petitions flowing from the Oakdale facility as a result of the lengthy delays in processing detainees for deportation," and the "atypical and unanticipated volume of habeas corpus petitions ... is beyond the capability of the district court to process in a timely fashion." Emejulu v. INS, 989 F.2d 771, 772 (5th Cir.1993).
 
 
 103
 The government, however, counters by asserting that, if we permitted suits against the Attorney General, aliens could engage in widespread forum shopping and bring suit in any district in the country. The government's concerns--though undoubtedly serious ones--may be overstated. We note that Supreme Court precedent establishes that traditional venue doctrines are fully applicable in habeas suits and that these, if strictly applied, would do much to prevent such forum shopping. Thus, in Ahrens, overruled by Braden, 410 U.S. at 500, 93 S.Ct. 1123, the Court held that the presence within the territorial jurisdiction of the district court of the petitioner was a prerequisite to the filing of a habeas petition. See Ahrens, 335 U.S. at 192, 68 S.Ct. 1443. On that basis, the Court concluded that aliens detained on Ellis Island could not--as a jurisdictional matter--file suit in Washington, D.C. Some years later, in Braden v. 30th Judicial Circuit Court of Kentucky, while rejecting the "inflexible jurisdictional rule" established by Ahrens and holding that a habeas suit did not have to be brought in the district where the prisoner was being held, the Court nonetheless reaffirmed the result in Ahrens as the proper product of "traditional principles of venue." Braden, 410 U.S. at 500, 93 S.Ct. 1123 (emphasis added).
 
 
 104
 The Braden Court noted that the petitioners in Ahrens were in New York, and that "[n]o reason is apparent why the District of Columbia would have been a more convenient forum, or why the Government should have undertaken the burden of transporting 120 detainees to a hearing in the District of Columbia." Id. Thus, the court held that normal venue principles "mandated the bringing of the action in the Eastern District of New York, rather than the District of Columbia" and that "Ahrens v. Clark stands for no broader proposition." Id. But Ahrens also stands for no less.[24] Accordingly, there is reason to think that strict application of "traditional principles of venue"[25] in alien habeas cases might adequately control the forum shopping in which aliens might try to engage were the Attorney General to be designated an appropriate respondent.
 
 
 105
 An additional factor, however, may counsel against the wisdom of so designating the Attorney General. Permitting the Attorney General to be named as a respondent in alien habeas cases would undoubtedly lead to the reduction of the overcrowded docket in the Western District of Louisiana (as well as other districts in which large INS detention facilities exist). But, when combined with the venue rules discussed above, it might only accomplish this by overcrowding those relatively few districts in which aliens disproportionately reside, districts that in many cases are already among the busiest in the nation.[26]
 
 
 106
 In the end, the question of whether the Attorney General is an appropriate respondent in habeas corpus petitions brought by aliens is one that evokes powerful arguments on each side--both at the doctrinal and at the practical level. Accordingly, its resolution should be avoided unless and until it is manifestly needed to decide a real case in controversy. Because it is possible that District Director Caplinger may fall within the reach of the New York long-arm statute, thereby making it unnecessary for us to decide this difficult question, we decline, for now, to rule on whether the Attorney General is a proper respondent in these cases.[27]
 
 
 107
 C. Statutory Interpretation--Retroactivity of AEDPA § 440(d)
 
 
 108
 Given that the government concedes that jurisdiction and venue are proper in the case of Navas, we turn to the merits of his claims. Navas argues that Congress did not intend § 440(d) to apply retroactively and to exclude from relief those aliens whose cases had already begun on the date of its enactment.[28] The government responds by citing to the Attorney General's contrary ruling in Soriano II. The Attorney General there held that § 440(d) barred relief to aliens whose cases predated the statute. This, she reasoned, presented no problems because applying § 440(d) to pending cases would not be genuinely retroactive. See Soriano II, 1996 WL 426888, at * 19. Relying on the Supreme Court's decision in Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Attorney General stated that the amendment merely "alters both jurisdiction and the availability of future relief" and "does not impair a right, increase a liability, or impose new duties on criminal aliens." Soriano II, 1996 WL 426888, at * 19.
 
 
 109
 Like the First Circuit in Goncalves v. Reno, 144 F.3d at 126, we reject the Attorney General's position and hold that § 440(d) does not apply to cases initiated before the date of its enactment.
 
 
 110
 The government contends that the statute is, on its face, ambiguous, and that the Attorney General's interpretation in Soriano II is therefore entitled to considerable deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[29] But this is by no means obvious. For, as the Supreme Court recently explained:
 
 
 111
 Under the formulation now familiar, when we examine [an agency's interpretation of a statute], we ask first whether "the intent of Congress is clear" as to "the precise question at issue." Chevron, 467 U.S. at 842, 104 S.Ct. 2778. If, by "employing traditional tools of statutory construction," id. at 843 n. 9, 104 S.Ct. 2778, we determine that Congress' intent is clear, "that is the end of the matter." id. at 842, 104 S.Ct. 2778. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843, 104 S.Ct. 2778.
 
 
 112
 Regions Hosp. v. Shalala, 522 U.S. 448, ----, 118 S.Ct. 909, 915, 139 L.Ed.2d 895 (1998) (citations abbreviated).
 
 
 113
 Accordingly, we turn to the initial step of the Chevron analysis--whether we can clearly discern Congress' intent through " 'traditional tools of statutory construction.' " Regions Hosp., 522 U.S. at ----, 118 S.Ct. at 915 (quoting Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778). For, if we can, "that is the end of the matter." Chevron, 467 U.S. at 842, 104 S.Ct. 2778. There is, of course, a strong presumption against retroactivity. See, e.g., Landgraf, 511 U.S. at 265, 114 S.Ct. 1483 ("The presumption against retroactive legislation is deeply rooted in our jurisprudence."); see also Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997) (holding that the AEDPA amendments to the provisions governing habeas corpus did not apply to pending noncapital cases). Thus, statutes are not ordinarily afforded retroactive effect unless "Congress has clearly manifested its intent" to have them so applied. Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 117 S.Ct. 1871, 1876, 138 L.Ed.2d 135 (1997).
 
 
 114
 Application of this presumption would require us first to consider whether the statute before us is genuinely retroactive. We are inclined to believe that it is. See Lindh, 117 S.Ct. at 2068; Goncalves, 144 F.3d at 128. But we need not decide the issue, since it is not necessary to rely on any presumption against retroactivity in the instant case. For, when § 440(d) is read in conjunction with the rest of the AEDPA and with the legislative history of that statute, there is abundant direct evidence that the section was not intended to apply retroactively.
 
 
 115
 Title IV of the AEDPA constricts the availability of relief from deportation for two categories of aliens--those involved in terrorism and those convicted of ordinary crimes. "Many of these provisions, with the notable exception of ... § 440(d), contain explicit subsections stating that they apply retroactively." Goncalves, 144 F.3d at 128. For example, "[u]nder AEDPA § 413, alien terrorists are made ineligible for several different forms of relief from deportation." Id. (footnote omitted). And Congress included in that section an express provision stating that the section "shall take effect on the date of the enactment of this Act and shall apply to applications filed before, on, or after such date if final action has not been taken on them before such date." AEDPA § 413(g). Congress' use of explicitly retroactive language in that part of the bill, and its failure to employ any analogous language in the nearby and closely related § 440(d), by itself strongly indicates that Congress did not intend § 440(d) to apply retroactively. See Lindh, 117 S.Ct. at 2063 (undertaking an identical analysis in distinguishing between the capital and noncapital AEDPA amendments to the statutory provisions governing habeas corpus).
 
 
 116
 Moreover, the AEDPA's legislative history, far from evincing a clear intent to make § 440(d) apply retroactively, suggests precisely the opposite. The Senate version of the antiterrorism bill contained a measure restricting the availability of § 212(c) relief for criminal aliens. That same section of the proposed bill stated that "[t]he amendments made by this section shall take effect on the date of the enactment of this Act and shall apply to cases pending before, on, or after such date of enactment." 141 Cong. Rec. S7559 (daily ed. May 25, 1995) (quoting S. 735, 104th Cong. § 303(f) (1995)). The House version, on the other hand, explicitly made the provisions governing terrorist aliens retroactive, but contained no similar language as to criminal aliens. See H.R. 2703, 104th Cong. § 611(b), 612(f) (1996).
 
 
 117
 The compromise bill that came out of the conference committee combined aspects of both the House and Senate bills. And it notably did not contain the Senate bill's language on retroactivity. Instead, it adopted the House version on this issue. This sort of "contrast in statutory language is 'particularly telling' when it represents a decision by a conference committee to resolve a dispute in two versions of a bill, and the committee's choice is then approved by both Houses of Congress." Goncalves, 144 F.3d at 132 (quoting FED v. NRA Political Victory Fund, 513 U.S. 88, 95, 115 S.Ct. 537, 130 L.Ed.2d 439 (1994)).
 
 
 118
 Thus, traditional rules of statutory interpretation all point in one direction: § 440(d) should not apply retroactively. Under Chevron, if by "employing [such] tools of statutory construction," we are able to discern the plain meaning of a statute, that ends the inquiry. Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. 2778. And "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Id.
 
 
 119
 To summarize, under ordinary rules of statutory construction, a statute that is silent with respect to retroactivity is not "ambiguous." In the absence of clear evidence that Congress intended some other result, such a statute does not apply retroactively. Here, there is considerable evidence of congressional intent, but it all argues against retroactive application. Therefore, the meaning of the statute, in this respect, is not in doubt, and we owe no deference to the Attorney General's interpretation of it. Accordingly, since Navas' deportation proceeding was pending on the date of the statute's enactment, we hold that § 440(d) does not apply to him.[30]
 
 III. CONCLUSION
 
 120
 Following Jean-Baptiste, we hold that aliens convicted of specified criminal offenses--who are precluded by the AEDPA and the IIRIRA from seeking direct review of their deportation, exclusion, or removal orders in the courts of appeals--may file habeas petitions in the district courts pursuant to 28 U.S.C. § 2241. We also conclude that this habeas review includes the claims brought by Navas, one of the petitioners before us. We decline at this time to resolve the issue of whether the Attorney General is a proper respondent for habeas actions brought by aliens facing deportation. Instead, we certify to the New York Court of Appeals the question of whether the New Orleans INS District Director in Yesil and Mojica's cases falls within the scope of the New York long-arm statute. Finally, we agree with the findings of the district court in Navas' case that the provision of the AEDPA that limits the availability of § 212(c) waivers does not apply retroactively to aliens whose deportation or exclusion proceedings were pending on the date of its enactment, and hence does not preclude his § 212(c) petition.
 
 
 121
 We further hold, due to the previous uncertainty in this area of the law, that petitioners like Henderson, who have filed for direct review of their deportation, exclusion, or removal orders, and who have received a stay of such orders during the pendency of their appeals, should have their stays continued for a reasonable time while they seek review pursuant to § 2241.
 
 
 122
 Accordingly, we dismiss, for lack of jurisdiction, Henderson's and Navas' petitions for direct review. We affirm the decision of the district court with respect to Navas' habeas petition. And we retain jurisdiction over Yesil and Mojica's petitions. After we receive a response from the New York Court of Appeals on the question (certified in a separate order) of whether the New York long-arm statute applies in their cases, we will dispose of whatever issues remain in their appeals. In the interim, we continue to stay Yesil and Mojica's deportation orders.
 
 
 
 *
 The Honorable Richard Owen, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 This case is concerned with the changes rendered to various provisions of the immigration laws by the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-208, 110 Stat. 3009 (1996) (the "IIRIRA") (both its transitional and permanent provisions). Collectively, we will refer to these laws as "the 1996 amendments."
 
 
 [2]
 But cf. note 9, infra, expressing a preference--were we writing on a clean slate--for direct review over habeas jurisdiction in cases of this sort
 
 
 [3]
 In addition, Henderson filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of New York on August 6, 1997. The district court has not yet ruled on Henderson's habeas petition
 
 
 [4]
 Under AEDPA § 440(d), Navas' two convictions would be classified as crimes of moral turpitude barring him from a § 212(c) waiver
 
 
 [5]
 Prior to the 1996 amendments, the law distinguished between deportation and exclusion proceedings. Aliens who were physically present in the United States were placed into deportation proceedings. Exclusion proceedings dealt with aliens who were literally at the border seeking entry as well as those who had been physically paroled into the country but who, through a legal fiction, remained for immigration purposes at the border. See 8 U.S.C. § 1252b (repealed 1996). The 1996 law combined the two proceedings into a new process known as a "removal proceeding." See 8 U.S.C. § 1229a (Supp.1998) (added by the IIRIRA)
 
 
 [6]
 The explicit authority to grant writs of habeas corpus was given to the federal courts in the Judiciary Act of 1789, § 14, 1 Stat. 73, 81-82. See Felker v. Turpin, 518 U.S. 651, 661, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (describing this provision of the Judiciary Act of 1789 as the direct ancestor of the current § 2241)
 
 
 [7]
 The IIRIRA's permanent provisions struck 8 U.S.C. § 1105a in its entirety and relocated the rules governing judicial review to 8 U.S.C. § 1252. The new § 1252 governs removal proceedings initiated after April 1, 1997. In the permanent provisions, the successor to AEDPA § 440(a) and transitional IIRIRA § 309(c)(4)(G) is found at 8 U.S.C. § 1252(a)(2)(C), which states that "notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in [certain sections of the code]."
 In addition, the permanent IIRIRA added a new catch-all provision, which reads as follows: "Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." IIRIRA § 242(g) (codified at 8 U.S.C. § 1252(g) (Supp.1998)). This catch-all provision is generally applicable, and does not apply solely to aliens convicted of specified crimes. See id. The IIRIRA further set forth that the permanent provision, § 1252(g) (limiting jurisdiction), "shall apply without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings." IIRIRA § 306(c)(1).
 
 
 [8]
 The Eleventh Circuit's opinion in Auguste v. Reno, 140 F.3d 1373 (11th Cir.1998), holding similarly, see id. at 1377 n. 9, has been withdrawn and superceded by Auguste v. Reno, 152 F.3d 1325 (11th Cir.1998). The new opinion is, however, inapposite to the cases before us since it declined to treat the petitioner's writ as having been filed under § 2241 (and instead treated it as a petition under now-repealed 8 U.S.C. § 1105a(a)(10))
 
 
 [9]
 Were we not bound by Jean-Baptiste, the members of this panel would be strongly inclined to find that the proper mechanism for judicial review is by petition for review in the courts of appeals, rather than by § 2241 habeas in the district courts. Neither approach is without problems in terms of the text and legislative history, but review in the courts of appeals seems more consistent with congressional intent. Congress clearly meant to streamline judicial review, and it seems perverse to find that the new laws actually added a layer of review in the district courts that did not generally exist before. Moreover, appeal of agency decisions directly to the courts of appeals is the standard mode of review of administrative actions. See, e.g., 5 U.S.C. § 7123 (1994) (establishing that orders of the Federal Labor Relations Authority are reviewed by the courts of appeals); 7 U.S.C. § 18(e) (1994) (setting forth that orders of the Commodity Futures Trading Commission are reviewable by the courts of appeals). And the Supreme Court has directly held that such review can be implied when its unavailability would raise serious constitutional issues. See Webster v. Doe, 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). Finally, were we to hold that direct review was available, so long as the review that remained was the equivalent of habeas, we would avoid all constitutional difficulties associated with a repeal of habeas. See Swain v. Pressley, 430 U.S. 372, 381, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977) ("[T]he substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention does not constitute a suspension of the writ of habeas corpus.")
 
 
 [10]
 The questions presented by these aliens are ones of pure law. We are not called upon in this case to review the agency's factual findings or the Attorney General's exercise of her discretion. See Goncalves, 144 F.3d at 125 ("Analytically, the decision whether an alien is eligible to be considered for a particular discretionary form of relief is a statutory question separate from the discretionary component of the administrative decision whether to grant relief.")
 
 
 [11]
 We also note that "[t]he language of § 2241 itself does not contemplate a limitation of jurisdiction only to constitutional claims." Goncalves, 144 F.3d at 123. Rather, the statute authorizes the courts to grant the writ when a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241. We stated in Jean-Baptiste that "[n]othing in the language of either the Antiterrorism Act or the Immigration Reform Act suggests that Congress expressly repealed § 2241, limited its scope, or eliminated the jurisdiction of the district courts." Jean-Baptiste, 144 F.3d at 219. Accordingly, in the absence of a clear statement from Congress indicating its intent to do so, we are reluctant to snip words from the middle of the habeas statute
 
 
 [12]
 We note that the questions of statutory interpretation at issue in this case are ones of general applicability, and do not involve the Attorney General's application of law to specific facts. Cf. generally Henry P. Monaghan, Constitutional Fact Review, 85 Colum. L.Rev. 229, 235-36 (1985) (distinguishing "law identification" from "fact identification" from "law application"). These types of questions most directly implicate the role of the courts in our system of separated powers "to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); accord Fallon, supra, at 1096
 
 
 [13]
 We need not, in this case, enter the debate over whether the Suspension Clause preserves the writ of habeas corpus as it existed in 1789 or as it has evolved over the past two centuries. But we do note that, even under an originalist approach, it would make little sense to say that the Suspension Clause was solely designed to protect the federal court's authority to grant habeas in cases involving direct and gross constitutional errors. The Constitution does not define the term "writ of habeas corpus," and so the founders were presumably referring to the common law writ as it existed at that time. And before the Constitution was enacted, the writ could only have been granted based on errors of law, since there was no such thing as a constitutional error. Nor would it have made much sense for the framers to have intended the writ, whose maintenance they decreed in such ringing words in Article I, § 9, cl. 2, to be available just for the enforcement of rights protected by the new Constitution, for in 1789 the rights guaranteed by the Constitution were limited indeed. The Bill of Rights, for example, was not adopted until 1791. Thus, the Constitution itself inevitably seems to mandate habeas corpus review of some statutory questions
 
 
 [14]
 And well they might concede this point, for the Supreme Court decided more than seventy-five years ago that the Constitution required judicial review of the executive's decision that a person facing deportation was a non-citizen. See Ng Fung Ho v. White, 259 U.S. 276, 284, 42 S.Ct. 492, 66 L.Ed. 938 (1922)
 
 
 [15]
 Our decision is premised on the notion that § 2241 habeas is constitutionally required only where the immigration laws have been interpreted to bar other forms of judicial review. See Jean-Baptiste, 144 F.3d at 218
 
 
 [16]
 The government concedes that both personal jurisdiction and venue were proper in the Eastern District of New York in the case of the third habeas petitioner, Saul Navas. Navas is a resident of New York, was ordered deported by INS officials in New York, and remains within the physical borders of the city. He named as respondents the District Director of the INS in New York, Attorney General Janet Reno, and INS Commissioner Doris Meissner. The fourth petitioner, Henderson, is before us only on direct review. His petition for habeas corpus relief is currently being adjudicated in the district court
 
 
 [17]
 Because we certify the question of whether District Director Caplinger properly falls within the ambit of the New York long-arm statute, we need not and hence do not consider whether the INS's District Director in New York, also named by Mojica as a respondent, may be appropriately deemed a custodian of Mojica for habeas purposes. The district court, having found personal jurisdiction on other grounds, also did not discuss this issue
 
 
 [18]
 New York law does not permit certification by the district court. See N.Y. Comp.Codes R. & Regs. tit. 22, § 500.17(a) (1998)
 
 
 [19]
 The district court in Mojica's case found that the Attorney General was a proper respondent, while the district court in Yesil's case did not reach the issue. See Mojica, 970 F.Supp. at 167; Yesil, 958 F.Supp. at 835-36. Because the Attorney General transacts business in New York on a regular basis, she is unquestionably subject to long-arm jurisdiction under New York law. See Nwankwo, 828 F.Supp. at 175 (citing Commentary, N.Y. C.P.L.R. § 301 (McKinney 1990))
 
 
 [20]
 In Ahrens, Justice Rutledge, joined by two other Justices, dissented from the majority opinion that declined to find proper territorial jurisdiction and venue with respect to a habeas petition involving aliens. The majority opinion expressly left open the issue of personal jurisdiction based on naming the Attorney General as the respondent. The dissent, instead, had to reach the question and concluded that the Attorney General was an appropriate respondent in the case. See Ahrens, 335 U.S. at 199, 68 S.Ct. 1443 (Rutledge, J., dissenting) ("There can be no question of the Attorney General's power to produce the petitioners in this case."). On the issue of territorial jurisdiction, Ahrens was subsequently overruled by Braden. See Braden, 410 U.S. at 500, 93 S.Ct. 1123
 
 
 [21]
 See, e.g., Goncalves, 144 F.3d at 110; Gutierrez-Martinez v. Reno, 989 F.Supp. 1205 (N.D.Ga.1998); Grodzki v. Reno, 950 F.Supp. 339 (N.D.Ga.1996); cf. Nwankwo, 828 F.Supp. at 173-75 (finding personal jurisdiction over the Attorney General, the only named respondent)
 
 
 [22]
 Billiteri emphatically held that the Board of Parole is not an appropriate respondent in habeas petitions involving prisoners seeking early parole. See Billiteri, 541 F.2d at 948. Nevertheless, Billiteri also noted in dicta that "when the Board itself has caused a parolee to be detained for violation of his parole," the parole board may qualify as a custodian for habeas purposes. See id. (emphasis added). The situation in the cases at bar is more than analogous, for the Attorney General certainly and by her own decision "caused [the aliens] to be detained." Id
 
 
 [23]
 It is potentially significant, however, under the Billiteri analysis, that the petitioners in this case are not currently confined in the INS' detention facility in Oakdale
 
 
 [24]
 In view of the Court's recognition that personal jurisdiction issues are generally resolved before questions of venue, see Leroy v. Great Western United Corp., 443 U.S. 173, 180, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) ("The question of personal jurisdiction, which goes to the court's power to exercise control over the parties, is typically decided in advance of venue ...."), the Supreme Court's Braden holding, explaining Ahrens on venue grounds, is noteworthy. For the Court's implicit decision in Braden that there was "a sound prudential justification for ... revers[ing] the normal order [and] considering ... venue" first, Leroy, 443 U.S. at 180, 99 S.Ct. 2710, suggests that the High Court was hesitant to explain the result in Ahrens by holding that in Ahrens the Attorney General was not a proper respondent. See Braden, 410 U.S. at 500, 93 S.Ct. 1123
 
 
 [25]
 As the Supreme Court explained in Braden, factors to be considered in determining whether venue is proper in a habeas suit include: (1) "where all of the material events took place"; (2) where "the records and witnesses pertinent to petitioner's claim are likely to be found"; and (3) the convenience of the forum for both the respondent and the petitioner. Braden, 410 U.S. at 493-94, 93 S.Ct. 1123; see also 28 U.S.C. § 1391 (1994 & Supp.1998) (setting forth the relevant factors in considerations of venue); Leroy, 443 U.S. at 186-87, 99 S.Ct. 2710 (noting that the convenience of the defendants and the location of evidence and witnesses are relevant in determining appropriate venue); Bates v. C & S Adjusters, Inc., 980 F.2d 865, 867 (2d Cir.1992) (holding that "the ... statute does not, as a general matter, require the District Court to determine the best venue")
 
 
 [26]
 See Statistics Division, Administrative Office of the United States Courts, Judicial Business of the United States Courts 122-24, 178-80 (1997) (compiling statistics of pending cases before United States District Courts)
 
 
 [27]
 Because we certify part of Yesil's case, it is also premature for us to consider whether the district court was correct in its finding that Yesil had accumulated the seven years of LPR needed to qualify for a § 212 waiver even before passage of the AEDPA
 
 
 [28]
 Since it is possible to decide this case on the ground that § 440(d) was not intended to apply to cases pending when the section was enacted, we need not reach Navas' broader argument that the statute should not apply to primary conduct--i.e., criminal convictions--that occurred prior to April 24, 1996
 
 
 [29]
 We note here the First Circuit's suggestion that "[t]he question of whether AEDPA § 440(d) applies retroactively may be viewed as a 'pure question of statutory construction for the courts to decide,' ... a question that is 'quite different from the question of interpretation that arises in each case in which the agency is required to apply [statutory] standards to a particular set of facts' which involves the agency's particular expertise." Goncalves, 144 F.3d at 127 (citation omitted) (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 446, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987))
 
 
 [30]
 With respect to Mojica, we note that he was in exclusion proceedings when the AEDPA came into effect. The fact that the INS subsequently chose to terminate the exclusion proceeding against him does not affect his claim, because the instant that Mojica's exclusion proceeding was ended, the INS started a deportation proceeding against him. Thus, Mojica's "case" (like Navas') was pending when the AEDPA came into effect